Committee, 0-4-4-7. Mr. Ekkert, you have the ability to vote. Good morning, ladies and gentlemen. So, my name is Dave Paglioli. I represent the appellant, in this case, Cliff Eckert, firefighter Cliff Eckert. As my brief states, it clearly is my position that the Illinois Workers' Compensation Commission decision, reversing arbitrator Flores' decision, was against the manifest weight of the evidence. I just ask, I have to ask a compelling question just to clarify. The crux of your argument in your brief is that the commission's decision was erroneous and they felt that the presumption was rebutted, correct? The commission issued a decision stating that they believe the evidence presented by the village of Oldsbrook successfully rebutted the presumption under section... And obviously you disagree with that. I disagree with that. And that's the crux of your appeal. That is, first of all, the crux of the appeal is that they're finding that the presumption was rebutted. It was against the manifest weight of the evidence. And then, alternatively, even if this Court would agree or maybe find that the presumption was rebutted, then, again, as you've instructed on earlier cases, that it's a manifest weight question, you know, with the facts and weight of the evidence. And I would argue that, again, the commission's decision in weighing the evidence is against the manifest weight. But in your brief, though, you really don't discuss the evidence or attempt to explain how you carried your burden once the presumption was rebutted. You seem to have an entire focus on the fact the commission erred in finding in the first place it was rebutted. You didn't have a very extensive argument on the manifest weight issue. I just wanted to point that out. But go ahead with your argument. Thank you. Again, just chronologically, interestingly enough, I think if you read the commission's decision, just to put it in context, when this case was tried before the arbitrator and ultimately went to the commission, this Court's two decisions, Johnston and Simpson, had not been issued. Ultimately, what appeared, reappeared in DuPage County Circuit Court. After we had briefed it, your decisions had come down, and ultimately the judge in DuPage County with the new case was ultimately looking into that for guidance, issued her decision as well. I thought about Simpson, that we decided, published opinion last April, right? I thought about Simpson and Johnston. I didn't have any other one at the same time. So tell us why the presumption was not rebutted. I will cite to Justice Holdren's dissent, and he was very clear in both cases. A very cogent dissent. Correct. A dissent nevertheless. A dissent, yes. When you're dealing with expert opinions, there has to be sufficient foundation to these expert opinions that is, you know, reliable and supportive of their position. My argument is outlined in the brief. When you look at Dr. Alterman's opinions, they are not supported by anything. Well, can we agree on this? He's an experienced board-certified urologist who treats people with prostate problems all the time. Is that a fair characterization? I would agree that he is a board-certified urologist, but he is not a board-certified toxicologist, epidemiologist, has done no research, is not an occupational medicine doctor. Does he have to be? I think in cases when you're dealing with occupational exposures and having knowledge about the research in the field, ultimately you have to have some expertise in how to read these research articles or participate in research. Again, do treating physicians or treating doctors or orthopedic specialists or whatever, do they frequently involve themselves in research? I don't think so. Some of them might, but the majority of their time, their focus is on treating the condition, not determining necessarily the cause of the condition. So I'm trying to call out the SSWA argument. The case law, at least the majority opinion in Simpson and the other case, talk about the presumption is overcome by, quote-unquote, some evidence to rebut the presumption. So could we conclude that the testimony of an experienced board-certified urologist who treats people with prostate cancer is not some evidence? How do we come to that conclusion? I believe you have to look at those opinions to determine whether that some evidence is sufficient to rebut the presumption. But he's a board-certified urologist. Granted, he doesn't have a degree in toxicology and these other things. And even your expert wasn't really somebody who treated a lot of people with prostate problems, did he? No, but he was actually a board-certified toxicologist, epidemiologist, occupational medicine, had 20 years' experience in the occupational health field for the city of Detroit for police and firefighters. All true. But what if your opponent gets up here and says, well, yeah, that's all true, but he's not a board-certified urologist. So let's throw his opinion out. I do, but let me point this out to you. Here's your board-certified physician that you say is qualified. But yet, clearly the evidence shows he misinterpreted, misread, and misstated the two studies he claims he relied upon to ultimately initially formulate his opinion. So here's the doctor that you say, well, he's well-qualified to issue opinions on this. His initial letter, his initial report, which is Deposition Exhibit No. 2, he cites from one study, that 32, the meta-analysis of 32 individual studies dealing with prostate cancer in firefighters. What does he do? I point to this statistic as supporting my position that prostate cancer doesn't occur any more frequently in firefighters than it does in the general public. Well, what really did he look at? He looked at the mortality rate, not the incident rate. He had to admit, oh, yeah, all right, I missed it. You're right, I misinterpreted it. Then this deposition, because he knew he only had that one study to rely on, he then presents a second study. The second study is the one that Homer studied in San Francisco, Philadelphia, things of that nature, and basically says, see, this study supports my contention. Again, he misreads the study. The study specifically says prostate cancer occurs more frequently in firefighters than the general public. Now, was this argument made before the arbitrator and the commission? Well, the arbitrator, no. The commission. Was it made before the commission? It was made before the commission. And so they were aware of your allegations regarding flaws in his testimony. That's correct. As the dissenting opinion of Commissioner Gore clearly pointed out, as the arbitrator clearly pointed out. And as Justice Holdrens has pointed out. And as Justice Holdrens has pointed out in the two cases, Simpson and Johnson. Did he make an argument that the reason why these studies suggest that the incidence of cancer is higher in firefighters is because they're tested earlier than other people, which increases the frequency of a diagnosis of cancer? He suggested that because they are tested more often. There's a higher, I guess, pool. Than the average citizen, let's say. But yet there was no study. He suggested that. Oh, I suggested that's why you have these findings. But yet there was no basis for that. I asked him questions in his deposition. Well, he said. Wait a minute. Did you have him disqualified as an expert? I did not. Well, then everything else goes to weight. Correct. Who determines weight? Not us. Commission. I believe that it's clearly the burden or actually the standard of review is, if it's clearly apparent, an opposite conclusion. I don't know. I don't know, to my own knowledge, nor can I take judicial notice, that the fact that firefighters are tested more frequently doesn't produce a skewed result in any testing of the incidence of cancer. I don't know that on my own. I can't take judicial notice of that. How do I know that's not true? I agree with that. But then you look at Dr. Alterman's opinions. His opinions, he claims, are based on these particular studies, the two studies he names. And then he said, well, I looked at all these other studies. Well, what studies are they? Well, I don't recall. Well, what basis did you use to say, listen, I weighed this study, I weighed this study, I looked at tens of additional studies, and based on those ten, I decided this was my opinion. Well, what basis did you utilize to exclude this study or that? I said, well, he didn't have an answer to that. Then he says, well, what is the cause of the cancer? His testimony is, well, we have four factors, right? He names them, heredity, drinking, all that stuff. Right, heredity, diet, ethnicity, and age. Well, age, he's younger, so we have to exclude that. Diet, we exclude that. Ethnicity, we exclude that. So he relied on heredity. Well, what about ingestion? Heredity is, the father was 76 years old when he was diagnosed with prostate cancer. Does that automatically mean that all his children, you know, male children, are going to be diagnosed with prostate cancer at the age of the early 50s? Can I ask you about the Johnson case you alluded to? Didn't in that case, in fact, the experts said that heredity was a possible cause of a heart attack. There's one factor, and we found sufficient, didn't we? Yes. So do we say now that Johnson was wrong a year later? I say, again, it is a fact-based examination on each case. And ultimately, in this particular case, I believe the facts support a finding that it was against the manifest way of the evidence. There's no basis for Dr. Alterman's opinions. He offered no basis for it. And, again, I didn't argue. I guess I will. I'll strike that being pointed out correctly that I didn't make an argument, a strong argument, in regard to if it's rebutted, then it's, again, a manifest way question. But, yeah, if the standard of review for the rebuttal of presumption is a manifest way, then you're just applying that down the road. You're just saying, okay, fine, it's the same facts. It's the same analysis. It's still in the mix. Right. Correct. So, and, again, I would argue that you look at the facts presented and the testimony of Dr. Alterman, and I believe, and I believe this point is fine. You know, it's a non-sympathetic experience. There is no basis. There's no rebuttal for his opinions. And I point out, is this any different than in the 1960s when big tobacco said, hey, cigarettes don't cause colon cancer, right? Is it any different than most recently when the issue regarding the CTE, chronic traumatic encephalopathy, was ultimately first suggested with concussions and athletes? Oh, wait, you know, there's not enough studies. Even Dr. Alterman admits, he says, listen, hey, my position, my opinions may change in the future if I'm provided with more research. Is that something that you say, okay, that's a solid decision that has a lot of reliability? No, but you're jumping ahead a little bit because the presumption, and sometimes referred to as bubble bursting, requires the presentation, as was stated in Johnson and Simpson, some evidence in opposition to it. And, again, if you have the testimony of a board-certified urologist who treats patients with prostate cancer, it would be pretty hard to find it is not some evidence. Can we just ignore that? That's correct. You weigh it. Now, does some evidence mean they'll just hire, you know, Joe Blow off the street, an MP with no credentials? Okay, he's going to testify. In my opinion, I'm a doctor. I'm licensed. And I would say my opinion is it's not causally related. But if he's board-certified in the field that treats people with prostate problems, it's not Joe Blow off the street, is it? No, it's not. But, again, then you can see how that plays. Well, here's the question. You treat someone who has a condition. Does that ipso facto mean they know the etiology of the condition? Isn't that your argument? That's your argument. He was not trained in toxicology. He's never been involved in research. Then in that particular case, your argument should have been he's not an expert and disallow his opinion entirely. Once he's let in as an expert, any of these things that you talk about go to weight only. They don't go to his credibility to give an opinion. Once you allow him to be accepted as an expert and testify as such, everything else goes to weight. And it's up to the trier of fact to determine weight. And now we get into the bubble as to what is the weight necessary to destroy that presumption. And the majority is saying some evidence. It may be spurious, but it's some evidence. At least the majority is saying that. Now let's assume that presumption has been overcome. The rest of your case, what they have is this Dr. Elderman, right? Correct. Saying that there's no causal connection between his employment and his condition of ill-being, right? Correct. What do you have? I have Dr. Chiodo, who is board certified in epidemiology, toxicology, occupational medicine, is involved in the research, has 20 years of experience in dealing with exposures in the city of Detroit, dealing with their employees, who has reviewed the research, provided the research, and offers his opinions that it's causally related. So you have Dr. Chiodo. Anything else? No. Okay. If you're saying that presumption has been met. That's right. That's correct. Well, we do have a letter from the treating doctor, Dr. Knighton, that specifically said just very briefly, you know, kind of in a manner, you know, the studies show that firefighters have a greater risk of developing prostate cancer. That was his treating urologist who wrote that letter. And that's in the record as well. And that was never addressed or cited to me by the commission at all. Okay. Thank you. I think you have time to talk. Thank you. Counsel, you may respond. Thank you. Okay. Please report. Counsel. John, just hold on a minute. I'm the employer. Mr. Figlioli essentially presented an argument today based on what the commission could have done or what he feels the commission should have done. But as we've already discussed, as part of your addressing part of what Mr. Figlioli raised this morning, that's not the appropriate inquiry on appeal to this Court. The appropriate inquiry here is whether or not the decision of the commission is against the manifest way of the evidence and whether or not there was sufficient evidence to support the findings of the commission. Let's get down to his core argument. There was a second argument. His argument is that the entrant was not qualified to give an opinion. Therefore, the presumption was not rebutted by some evidence. Are you conceding that it was not rebutted by some evidence? It was certainly. It was rebutted by some evidence. There was no doubt about that. So why are we jumping into manifest way? That's the first issue. Yes. Because if it wasn't rebutted, he doesn't need to worry about manifest way. Right. So it was rebutted. There was some evidence. I think, Your Honor, it hit the nail right on the head when you were asking questions to Mr. Figlioli. Because essentially, you're taking the position, if you are the plaintiff in this case, that having testimony from a board-certified urologist about a field that's distinctly within the urology field, that that's not sufficient to be some evidence to rebut a presumption. And in addition to that, it's not just having a board-certified urologist who's testifying the fact. He's essentially said that he's familiar with what's recognized as the risk factors within the community of urologists that deals with prostate cancer. He's familiar with the studies that are in the board, the peer-reviewed literature that's relied upon by urologists as to what the risk factors are. So to suggest this morning that he doesn't deal with toxicology, so he has no idea what the risk factors are. Toxicology, epidemiology, he's saying he's not qualified because he's not an expert in those fields. I would suggest it makes no sense. I mean, as a board-certified urologist who goes to the training, who goes to seminars, who reads the peer-reviewed literature on the field of urology, he's going to know what's accepted as risk factors for prostate cancer. Why does he want to know those risk factors if he's a treating urologist? I'm sorry. Why does he want to know those risk factors if he's a treating urologist? Because it's important in dealing with patients and what the risks are diagnosing patients. Do you have a family history? Is it significant for me as your treating urologist that I should have you screened at the age of 40 rather than 50? Because perhaps you have a family history or perhaps you have other risk factors. All of those things would be significant to a treating physician. It's almost ludicrous to suggest that someone who practices in that field as a urologist would not be acquainted with the risk factors that are accepted as being related to the development of prostate cancer. And then he did review the studies. He did an independent review of the studies. And Mr. Figueroa suggested that because he knew he was wrong in one study, he added up some other studies to hang his hat on. What happened was at the deposition of Dr. Scioto, Mr. Figueroa came in with a bunch of studies, dropped them on the table, and had Dr. Scioto testify to them. So I obviously sent those to my expert to say, these are the studies that are being relied upon by a claimant's expert. You should review these as well. And he testified to what the incidence was based on those studies. And the studies disagree. Yeah, there was one study that Mr. Figueroa pointed out that he relied on mortality table rather than an incidence table. That was one of many studies. There were a bunch of studies that were discussed, many of which Dr. Alterman reviewed and said, there's flaws in the study. The size is not appropriate to make that kind of determination. The statistical significance has not been deemed acceptable because they call it crossing the axis of one, which is a confidence interval question as to whether or not a study is deemed statistically significant. He commented on that. And by the way, was all of this brought out in front of the commission? Yes, absolutely. Right, the commission made its determination. And the determination is, in our mind, entitled to wait. I mean, this is directly the province of what the commission is supposed to do. Let's look at the expert, and did they provide sufficient weight so you can rebut the presumption? The commission decided yes. One should rebut the presumption with some evidence, which I think is very clear in this case that we did. Before I go on from that, I do want to point out, the family history thing is significant as well. I mean, if you're looking for some evidence to rebut the presumption, I don't believe, I would submit to you that the employer is not responsible for providing an alternate cause of what caused the disease, but in this case he did suggest there was an alternate cause. So that's even more weight to the fact that there is some evidence that this gentleman's father, hereditary genetic factor, also was diagnosed with prostate cancer, which is deemed by neurologists to be the most significant risk factor. So it did present an alternate cause as well, but shouldn't be sufficient to rebut the presumption. But once you rebut the presumption and you get to the question of weighing the evidence between Dr. Alterman and Dr. Ciotto, that's, again, directly the province of the commission. That's what the commission is empowered to do. We take the determinations made by respective experts. We put them in the scale. We weigh them. We make the decision. That decision is entitled to weight. And there's support for what the commission did. The commission had three or four pages of... for what the commission decided. I mean, that goes without saying. Right. In this case, there is evidence to support what they determined. And very clearly, if you're looking at the comparison between two experts, Dr. Alterman and Dr. Ciotto, they can look at the fact that Dr. Alterman is a board-certified neurologist, that he is familiar with this field, that he is familiar with the literature, that he is familiar with treating patients with prostate cancer, and then look at Dr. Ciotto on the other side. Sure, he was very vocal about announcing his credentials in this deposition. There's no doubt about that. But when you look at what he really is as far as a doctor, he doesn't treat any patients in the state of Illinois. He barely treats patients at all. He essentially admitted he has a handful of internal medicine patients that he sees in the state of Michigan. He is bread and butter. He's testifying on legal matters. He's a licensed attorney. I think his deposition did a good job of showing why he's a licensed attorney, because it really spilled over into open advocacy rather than giving a medical opinion. So the commission is entitled to look at that and look at what his qualifications are, look at what his testimony was and base his testimony to make a determination. We think Dr. Alterman is more credible. We think Dr. Alterman is more credentialed. And there's certainly weight in the evidence in this case to support that finding by the commission, and therefore it's our mission. Well, really these cases rest upon, you know, this treatment issue. I'm not sure that it's as weighty as you might want to suggest it is, because we're really looking at exposure, aren't we, leading to a condition of ill-being. Correct. And so we have the condition of ill-being, which is a prostate cancer. Correct. And under the act here we're talking about did the work environment, in the fireman's case, expose him or her to, in this case it has to be a him, to some toxic substances, et cetera, that have some linkage to this condition of ill-being. Correct. To this specific. Yeah. So really, really we don't really care about the protocol for treatment of the condition of ill-being, do we? Because unless you can show that you would do a different treatment to that condition of ill-being, depending upon the cause or speculative or ascertained cause of that ill-being, it's not relevant. Well, the treatment itself is not relevant. Let me give you an example as to why that colors the expert opinions and why the knowledge of the condition, the knowledge of the field of urology is important. Dr. Cioto, in his testimony, actually made a statement towards the end of his testimony. One of his studies dealt with an increased incidence of bladder cancer, a different type of cancer. And Dr. Cioto specifically said that's further evidence that there's an increased risk of prostate cancer because you know the bladder and the prostate, they're right next to each other. That's actually in his testimony, in his deposition. So that is an incident where you can show one expert, Dr. Cioto, not being familiar with the area of medicine in question, tries to suggest that bladder cancer and prostate cancer essentially must be caused by the same thing because they're next to each other anatomically. It makes no sense. Dr. Helderman rebutted that and refuted that in his testimony as a urologist. So there is, yes, treatment itself is not important in this case. He rebutted that? He refuted it. Helderman? Correct. Okay, on the basis of? I think he actually analyzed the fact that, I mean, bladder takes in chemicals and things run through the bladder. I don't want to get too specific here. Why not? Okay. You're being recorded. If you're ingesting chemicals, theoretically they would go through your urologist's tract. They would go through your bladder. They don't go through your prostate. So he discussed that in his deposition. It's in his testimony why the rather odd statement by Dr. Cioto actually doesn't make sense and the urologist would recognize that that's false. So there's no moustache. I can't even pronounce it. Moustache, what is it? Metastasis. Thank you. Yes. So if you have a cancer in one organ, it wouldn't spread to another. Well, it was discussed. I mean, I can't speak to that. I'm not a physician. Well, we'd like an oncologist probably to tell us that. But we don't have one in the record. We don't have one in the record. All right. Any other questions? I don't think there are. Thank you, counsel. Counsel, you may reply. Okay. Thank you, counsel, both for your arguments in this matter. This morning will be taken under advisement and a written disposition shall issue.